*515
 
 BRUNOT, X
 

 The plaintiff filed separate but similar petitory actions, except as to the particular property described in the petitions, against the two defendants. As the suits were consolidated and tried together we shall treat them as one action.
 

 The suits are for the recovery of the estate of Ed Sudlind, deceased. The recorded title to a part of the property of the estate is in the name of Mrs. Mary K. Booth, and the title to all other property belonging to the estate is now in the name of Dr. "W. M. Ledbetter. Ed Sudlind died on March 12, 1902, leaving an estate consisting entirely of his interest in the community of acquets and gains existing between him and his surviving spouse, Mrs. M. A. Sudlind. Upon the application of Mrs. Sudlind who alleged that Ed Sudlind died intestate, without issue, or forced heirs, or known collaterals, she was recognized as widow in community, and, as such, was sent into possession of one-half of the community property as owner in her own right and as usufructuary of the estate. of the deceased. Several years thereafter, it appearing that the deceased had left no known heirs, Mrs. Sudlind was recognized and sent into possession of the estate as the sole heir of her deceased husband. As sole owner of the whole property Mrs. Sudlind transferred the entire property to J. M. Ledbetter. Subsequently X M. Ledbetter died and the title to the property became vested in Dr. W. M. Ledbetter, from whom Mrs. Booth acquired a part of it. A few years after these transactions a purported olographic Will of Ed 'Sudlind is alleged to have been discovered. This will names the plaintiff as the universal legatee of the testator and bequeaths to her all of the property of whatsoever kind the testator owned at his death. The will was probated, registered, and ordered executed, and plaintiff sues to recover from the defendants an undivided one-half interest in all of the property each defendant now owns that belonged to the estate of the deceased.
 

 Three defenses are pleaded. The first attacks the validity of the will; the second is that Mrs. Sudlind, the author of defendants’ titles, was recognized as the sole heir of her deceased husband and was sent into possession of his estate by virtue of a regular judgment of the court rendered 15 years before the probate of the alleged will; and the third is the acquisitive prescription of 10 years under a title translative of the property.
 

 The trial judge found that the will was a forgery, and he therefore dismissed both cases, and plaintiff appealed. If we concur in the trial judge’s finding of fact, the judgments are correct and should be affirmed, and consideration of other issues presented would be vain and useless.
 

 It is admitted that Ed Sudlind died March 12,1902; that he left an estate in community with his, surviving spouse, consisting of the properties described in the plaintiff’s petitions ; that shortly after his death his widow in community was recognized and sent into possession as owner in her own right of one-half of the community property, and as usufructuary of the other half; that later she was recognized as the sole heir of her deceased husband, and, as sucji, was sent into possession of his estate as owner thereof; that she sold the entire .property to X M. Ledbetter; that X M. Ledbetter died and Dr. W. M. Ledbetter acquired the property; and that Dr. M. Ledbetter transferred a part of said property described as parts of lots 17 and IS of the W. W. Smith subdivisión to Mrs. Mary K. Booth.
 

 The record discloses that the alleged olographic will under which the plaintiff, as universal legatee of the testator, claims his estate, is dated January 24, 1902; that it was found in an old trunk about 21 years after the death of the testator; and that in ex parte proceedings it was probated, registered, and ordered executed in 1923.
 

 
 *517
 
 The learned trial judge, in a carefully written opinion, has reviewed the testimony relating to the purported will at length. He saw and heard the witnesses testify, and, for that reason was in a better position to determine the weight and probative force to be given their testimony than we occupy with nothing before us but the typewritten transcript. His conclusions of fact are therefore entitled to great weight. He found, as a fact, that the only witness, J. H. Forshee, who testified to the confection of the purported will, was unworthy of belief. The testimony of the witness, as it appears in the record, shows that the statements made on his direct and cross examinations are conflicting and irreconcilable. We therefore have no hesitancy in accepting as correct the conclusion of the trial judge that no credence can be placed upon the testimony of this witness.
 

 Three recognized experts on handwriting, viz. Prof. J. H. Spencer, and Messrs. B. O. Farrar and E. A. O’Sullivan, and a near expert, Mr. Arthur Kahn, the vice president of the Commercial National Bank of Shreveport, who was the individual ledger bookkeeper of the bank when the deceased did business with that bank, and who was familiar with the handwriting and signature of the deceased, testified in the case. Prof. Spencer was of the opinion that the document which was probated as the will of Ed Sudlind was the genuine will of the deceased and that it was entirely written, dated, and signed'by him. The other experts and Mr. Kahn were equally positive that the will was a forgery. All of the experts gave exhaustive and pursuasive reasons for their conclusions, and Mr. Kahn testified from his personal knowledge of the signature of the deceased. It may be noted here that Mr. Farrar is Assistant Chief of the Accounting Division of the Treasury of the United States, and is examiner of questioned writings for the Treasury Department of the federal government.
 

 The purported will is written upon a piece of typewriter paper which is watermarked “erkshire Bond U S A.” The first two words of the watermark are on one line and the “U S A” on the line beneath them. All of the letters in the watermark are of the same size, except the B in the word “Bond,” which B is about one-third larger than the other letters. For the purpose of fixing the time the paper bearing the above watermark was first manufactured and marketed, defendants had the testimony of Mr. J. E. Col-ton taken under commission, and, with respect to his depositions, the trial judge says:
 

 “The most decisive testimony in the whole ease is given by Mr. J. E. Colton, of Pitts-field, Berkshire county, Mass. Mr. Colton is the manager of the typewriter paper department of Eaton, Crane & Pike Company, which concern is one of the largest, oldest, and most reputable manufacturers of paper in the United States. Mr. Colton has been with this concern since 1890. In giving the testimony of this witness, we can disregard entirely what he says as an expert and merely give what he states as facts within his personal knowledge.
 

 “When paper is being manufactured the watermark is embedded in same about as follows: Very thin type is made for the watermark. This type is soldered on what is known' as the ‘dandy roll.’ When the paper is in a soft, pulpy state, but approaching the dry state, it passes, in sheet form, over the ‘dandy roll.’ Just where the type is formed on the roll, the sheet is pressed by the type just a little thinner than the other parts, and this leaves in the paper, in an indelible manner, the imprint of the type. Sometimes, during the process of manufacture, one or more of these letters, which are soldered on the ‘dandy .roll’ will become dislodged and fall off. Under such conditions the paper will
 
 come out
 
 with one or moz-e of the letters missing from the watermark.-
 

 “Mr. Colton testifies that he himself prepared the sketch from which the type was made for the watermark of ‘Berkshire Bond USA’; that this sketch was made' on December' 19, 1905; that paper bearing the above watermark was first placed on the market in the spring of 1906; that between December 12, 1907, and October 11, 1909, the letter B in the word ‘Berkshire’ was dropped from the' dandy roll, and likewise1 from the watermark on five
 
 *519
 
 different lots of paper, and these lots, therefore, went on the market watermarked ‘erkshire Bond.’ He attaches samples of both kinds to his depositions, and while we are not experts on paper, to the uninitiated eye the grade of the samples is the s'ame as that on which the purported will is written, and it is absolutely plain that the lettering of the watermark on the samples is identical with that of the purported will. He further testifies that he knows of no concern making ‘erkshire Bond U S A,’ and that, so far as he knows, his concern is the only one that has ever made ‘Berkshire Bond U S A.’ Of course, this latter is negative testimony, but it is corroborated to a large extent in this case. In the paper trade a directory is gotten out each year which is accepted in the trade in about the same way as is Dunns or Bradstreets in the financial world. This is known as Lockwood’s Directory and it gives every available kind of information. From 1901 to 1923, this directory fails to show any ‘erkshire Bond U S A,’ but does show a ‘Berkshire Bond USA’ made only by Eaton, Crane & Pike Company.
 

 “This does not show absolutely, and beyond the range of possibility, that some concern, prior to 1902, did not make a typewriter bond paper with a watermark ‘erkshire Bond USA’ which did not appear in Lockwood’s Directory, and which was exactly the same as that first made by Eaton, Crane & Pike Company, in 1907, both as to grade of paper and the lettering of the watermark, but it is almost beyond the rangé of human credulity to believe that any such paper was made. Necessarily such unknown manufacturer could not have forged that gotten out by Eaton, Crane & Pike Company, for Eaton, Crane & Pike Company did not make this particular paper until 1907, while the will is supposed to have been written in 1902, and it is unbelievable that a concern like Eaton, Crane & Pike Company, shown to be about the oldest and most reputable paper manufacturer in the United States, would forge a watermark of some unknown manufacturer.”
 

 It is shown that the machinery and equipment necessary for the operation of a paper mill requires the expenditure of a large sum of money; that a minimum outlay of $100,-000 or $200,000 is necessary to erect such a plant, and therefore it is most improbable, if not impossible, for. a concern of this magnitude to have operated in the United States without being listed in Lockwood’s. Directory. In the absence of even an intimation, anywhere in the testimony, that'such a concern did exist, we think the testimony leaves no room for a reasonable doubt that Eaton, Crane & Pike Company are the only paper manufacturers in the United States who have made and marketed a typewriter paper watermarked either “Berkshire Bond U S A” or “erkshire Bond U S A.”
 

 It is also shown, by two physicians, that any person affected as the deceased was for some months prior to hi? death loses control of the co-ordination of his muscles and correspondingly his use of the pen, in writing, is impaired. The photostatic copy of the will in the record, to the uninitiated eye, leaves no room to doubt that the person who wrote the purported will had muscular control of the arm and hand and was free from nervousness at the time it was written.
 

 In summing up the proof, the judge says:
 

 “To hold that the will in question is genuine, in our opinion, we would be forced to entirely disregard the testimony of Mr. Colton, and the exhibits he annexes to his deposition, and we have before us nothing which would give us the right to so disregard this testimony. We are fully aware of the rule that fraud is never presumed; that it must be fully proved; and if two constructions can be placed on testimony, one showing fraud and one showing good faith, the court should adopt the one showing good faith,” etc.
 

 We think that fraud should be proven to that degree of certainty which warrants the conviction of a person who is charged with the commission of a crime, i. e., beyond a reasonable doubt.
 

 In this case it is shown beyond a reasonable doubt that the purported will is written upon paper that was not made and marketed until five years after the death of the alleged testator, and therefore there is no escape from the conclusion that the document purporting to be the will of the deceased is a forgery.
 

 For the reasons stated, the judgment appealed from is affirmed, at appellant’s cost.