Plaintiffs sue to annul a sale of one-half interest in the oil, gas and other minerals in, under and that may be produced from the southwest quarter of southeast quarter (S.W. 1/4 of S.E. 1/4) and southeast quarter of southwest quarter (S.E. 1/4 of S.W. 1/4), section eighteen (18), township fifteen north (15 N.), range three east (3 E.), in Ouachita Parish, La., that was signed by them on July 12, 1943, wherein Francis S. Barringer is named purchaser. The sale was made subject to any valid oil and gas lease affecting the land, and it is specifically declared therein that it embraces one-half of "all the oil royalties and gas rentals or royalties due and to become due under the terms of any such lease, and like interest in all money rentals that may *Page 201 
thereafter be paid to keep such lease in effect without drilling". The price paid to the plaintiffs was $220.
At the same time the mentioned sale was signed, plaintiffs also executed to Barringer a regular commercial oil and gas lease on the land, wherein it was stipulated, among other things, that in the event of production of oil or gas therefrom, while the lease was in effect, subject to certain named stipulations and conditions, the lessors would be paid the market value of one-eighth of such production, referred to as royalty. The price paid for the lease was $80, which, it was stipulated, would keep the lease in effect without drilling operations for one year. It was further stipulated that the lease could be kept in effect for an additional period of nine years without drilling operations by the payment to the lessors or their assigns $80 annually on or before the 12th day of July of each year. The Ouachita National Bank in West Monroe, La., was designated as the depository for money rentals payable under the lease.
Mr. Barringer was represented by Laza Caspari, as agent, in the negotiations leading up to and culminating in the signing of said two instruments.
Plaintiffs alleged that Caspari came to see them on July 12, 1943, and stated that he desired to buy an oil and gas lease on said land; also one-half of the royalty thereunder, and offered $80 for the lease and $220 for one-half of the royalty, which offers were accepted by them; that Caspari had previously drawn and then and there presented to petitioners an oil and gas lease which they signed, and at the same time he presented to them the other document represented by him to be a deed to one-half of the royalty stipulated in said lease, which was also signed by petitioners under the belief that said instrument was of the character represented by said Caspari. They further alleged that it was not their intention nor desire, and at no time did they agree to sell to Caspari or Barringer any part or portion of their mineral rights in, to and under the said land; that their signatures to the instrument evidencing such sale were affixed in error by reason of the fraud, artifice and misrepresentation of said Caspari in whom they, being illiterate colored people, reposed confidence. They also aver that the error into which they were led and the true character of the sale they signed were unknown to them until the first delay rentals fell due; that at that time they learned that only $40 had been deposited in said depository bank for their account to keep in effect said mineral lease for one year; that they then promptly repudiated the sale and refused to accept the $40. For the reasons afore mentioned, the purported sale to Barringer is attacked and its annulment prayed for. In the alternative, reformation of the instrument into a sale of one-half interest in the royalty stipulated under the mineral lease is prayed for. Caspari and Barringer are made defendants.
Plaintiffs averred willingness to refund the $220 paid them by Barringer in the event the sale to him is annulled, and tendered the amount in their petition.
Answering, Barringer in effect generally denied the allegations of the petition save that Caspari, acting as his agent, procured the lease and sale of minerals from the plaintiffs in keeping with his (Barringer's) wishes and instructions; that he was not present when the instruments were signed and has no personal knowledge of any conversation had between the parties prior to the signing of the documents; that he believes, and, so believing, avers that plaintiffs fully understood the nature of the sale to him and accepted the price therein on that basis.
Caspari, in substance, denies that he misrepresented to plaintiffs the character of the sale they signed and denies that they signed the same in error, through misrepresentation, fraud and/or artifice on his part, but, on the contrary, avers that they fully understood they were selling one-half interest in the minerals and that the instrument truly embodies the terms and conditions of their agreement. He also avers that in procuring the lease and sale he acted in the capacity of agent for Barringer, and acquired no proprietary interest in the rights devolving under either instrument; that he received from Mr. Barringer a commission for his services only.
Defendants prayed that plaintiffs' suit be dismissed at their cost and judgment was accordingly rendered in their favor. Plaintiffs appealed.
One of the immediate as well as principal differences between a sale of minerals and a sale of a royalty only, or a part thereof, under a mineral lease, concerns renewal rentals. If royalty is sold, all renewal rentals go to the lessor or his assigns, but if a sale of mineral rights is made without restriction or reservation as *Page 202 
regards to whom rental renewals shall be paid, the purchaser or his assigns is entitled to participate in renewal rentals according to his or their interest in the minerals.
Plaintiffs live nineteen miles from the City of Monroe, the residence of the defendants. Mr. Caspari had several conversations with Leroy Woodward, one of the plaintiffs, about leasing the land for minerals, but Woodward is positive in no conversation was a sale of any part of the minerals mentioned. The day the instrument was signed, Mr. Caspari drove down to the land, then occupied by plaintiffs, and stopped at Leroy's house. A man by the name of C.P. Collins acted as his chauffeur. Willie Woodward, also a plaintiff, was there, or soon after arrived. Their sister, Matilda King, was sent for and she and her husband, Fred King, joined the others at Leroy's home. All four of these colored people testified in plaintiffs' behalf. They understood very little about mineral rights, royalties, etc. Having had no prior experience in such matters, they had to depend upon others to inform them as to the meaning of terms used in discussing such subjects. It was quite natural that they, especially Leroy, should look to Mr. Caspari for correct advice and information in the negotiations prior to signing the instrument. These three plaintiffs are positive that none of them agreed to sell any interest in their mineral rights and stated further that they would never have signed the sale had they understood its true import. Fred King is equally positive that a sale of the minerals was not discussed at the time nor agreed to by either of the plaintiffs, but, on the contrary, a sale of one-half interest in the royalty was discussed and agreed to. All of these parties are positive Mr. Caspari told them that the instrument was only a sale of one-half of their royalty or one-sixteenth interest in production if and when obtained.
Mr. Caspari testified that the sale was read in full and explained to plaintiffs before they signed it. He also testified that as he was reading the instrument Collins got out of the car, walked up the steps and on to the porch, heard him read the document, and thereafter signed the instrument as a witness; that after he had completed reading the act he turned to Collins and asked him: "* * * You understand what I am buying from these people, and he said 'yes'; * * *."
The clear preponderance of the testimony sustains the contention that the sale was not read to plaintiffs before it was signed. Plaintiffs and King say that Collins, who to this time was in his car fifty feet away, was called in to witness the acts after plaintiffs had signed them. Collins, himself, does not corroborate the testimony of Caspari nor of plaintiffs. On the contrary, he testified that the instrument was brought to him while he was in the car and he signed it there. Regardless of all this, his testimony and that of plaintiffs and King is diametrically opposed to that of Caspari, as concerns the reading of the act of sale. Collins, if he signed the act while in the car, could not have been asked the question that Caspari testified he asked him.
Had Mr. Collins' testimony been in all respects of a positive character, it would have had considerable influence in determining the issue involved in this case. But, regretfully, in the main, his testimony is uncertain and equivocal. He was introduced as a witness for the defendants. Their counsel concurs in the conclusion that his testimony has small probative value.
In the instant case it is made quite clear from the testimony of the plaintiffs and also of Fred King that plaintiffs were opposed to making a sale of any sort that would affect their right to the annual renewal rental stipulated in the lease contract. In other words, they were willing to sell only one-half interest in the one-eighth royalty stipulated in their favor in the mineral lease. This is definitely reflected from the action of Leroy Woodward, the older of the three co-owners. He appears, to a large extent, to be the counselor and advisor of his brother, who is fifty-one years old, and his sister.
In October, 1944, three months after first renewal rentals fell due, Leroy Woodward went to the clerk's office of Ouachita Parish and ascertained from that official to whom the mineral lease was made, and where the rentals should be paid. He, at once, went to the depository bank and asked if the rental had been left there. He was told that only $40 was there for plaintiffs' account. He declined to accept the amount and then sought advice of an attorney in West Monroe. This attorney advised him to take the matter up with Mr. Barringer, and this was done, but Mr. Barringer declined to do anything that would modify *Page 203 
his rights as reflected from the face of the act of sale. This suit immediately followed.
We are favorably impressed with the attitude of Leroy Woodward in this controversy and believe his course has been influenced by honest motives throughout. The following testimony given by him reflects this:
"Q. It is your purpose in this suit to just set this whole thing aside; in other words, you didn't sell him anything? A. No, sir. Here is my purpose; my purpose is to straighten that out; let the Court decide what was an honest deal is all I want; not out for no fraud or nothing. I just want the Court to decide and give me the benefit of my rights. That's all I want."
There is not present in this case the motive that so often actuates contractants in mineral leases and sales of mineral rights when escape from the binding effect thereof is sought on the alleged grounds of fraud, misrepresentation, error, etc., to-wit: The desire for greater gain due to production in paying quantities of oil or gas on the land or near thereto. So far as disclosed by the record, the land involved is now not more valuable for mineral possibilities than when the attacked sale was signed.
[1, 2] It is a cardinal rule of law, as concerns contracts, that matters discussed and agreed upon by the parties prior to affixing their signatures to the instrument are presumed to be incorporated therein; in other words, the written act is presumed to accurately reflect the oral agreement reached by the parties. And testimonial proof contradictory of the contract's unambiguous language is not admissible save under specific allegations of fraud, misrepresentation, etc., on the part of one party, of such character as to induce the other party to sign the same, whereas but for such he would not have done so. Civil Code, art. 2276.
Fraud, as applied to contracts, is defined by the Civil Code, art. 1847, as follows: "* * * is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. * * *"
[3, 4] However, fraud and similar acts are never presumed. He who alleges such acts on the part of a contractee, as a means of avoiding the contract, is held to strict proof of the same. This proof must be stronger than a mere preponderance of the evidence. Belcher v. Booth et al., 164 La. 514, 114 So. 116; Domangue et al. v. Duplantis, La. App., 162 So. 596; Butter et al. v. Austin, La. App., 150 So. 449.
[5-7] It is also true that of the four essentials to the confection of a valid contract consent legally given is primary. Civil Code, arts. 1766 and 1779. The minds of the contracting parties must have met, as regards the substantial elements of the contract, as a condition precedent to its validity. And when, as in this case, the testimony clearly establishes that the minds of both sides to the contract did not meet touching the primary matter involved, consent was absent, and the conclusion is inescapable that plaintiffs were in error in signing it.
[8, 9] It is argued on behalf of defendant, Barringer, that since he was not present when the sale was signed and has no knowledge of what representations his agent made to induce plaintiffs to sign same, even though plaintiffs' charges be correct, this should not vitiate the contract. In other words, it is contended, personal innocence of the principal protects him against the wrongdoing of the agent. Article 1847 of the Civil Code is cited to support this position. That article does declare that if in the confection of a contract, artifice is practiced by a third person "without the knowledge of the party who benefits by it", this should not vitiate the contract. The answer to this contention is that Mr. Caspari is not a third person. Mr. Barringer was acting through him, and for all legal intents and purposes the situation is the same as if he had acted for himself. This principle is abundantly supported by authority. See: 2 American Jurisprudence, § 362; Morehead Mfg. Co. v. Howard's D. G. S., Inc., Odorless Cleaners, La. App., 172 So. 549; American Guaranty Co. v. Sunset Realty and Planting Co., Inc., et al., 23 So.2d 409; McIntire et al. v. Pryor, 173 U.S. 38, 19 S.Ct. 352, 43 L. Ed. 606.
Plaintiffs are entitled to recover on their main demand.
For the reasons herein given, the judgment appealed from is annulled, reversed and set aside, and, subject to the condition hereinafter stated, there is now judgment in favor of plaintiffs, Leroy Woodward, *Page 204 
Willie Woodward and Matilda King, and against the defendants, Laza Caspari and Francis S. Barringer, annulling, avoiding and declaring without legal and binding effect the sale of minerals attacked in this suit, and which affects the southwest quarter of the southeast quarter (S.W. 1/4 of S.E. 1/4) and southeast quarter of southwest quarter (S.E. 1/4 of S.W. 1/4), section eighteen (18), township fifteen north (15 N.), range three east (3 E.), in Ouachita Parish, La.
It is further ordered and decreed that as a condition precedent to the effectiveness of this judgment and decree, plaintiffs, within 60 days from finality thereof, shall pay to said Barringer the sum of $220, with 5 per cent per annum interest from April 12, 1943; and upon production of satisfactory proof of such payment or of deposit of the amount in bank to the credit of said Barringer, the Clerk and Recorder of Ouachita Parish, La., shall cancel and erase from the records of his office the inscription of said sale.
Defendants are cast for all costs of suit.