**TRINITY CARTON COMPANY, INC.,**
Plaintiff-Appellee, Cross-Appellant,

v.

**FALSTAFF BREWING CORP.,**
Defendant-Appellant,
Cross-Appellee.

No. 83–3623.

United States Court of Appeals,
Fifth Circuit.

Aug. 5, 1985.

Rehearing and Rehearing En Banc
Denied Sept. 30, 1985.

186

Molony, Nolan, North & Riess, Ernest A. Burguieres, III, Lawrence J. Molony, Bruce A. North, Metairie, La., for defendant-appellant, cross-appellee.

James J. Morrison, New Orleans, La., for plaintiff-appellee, cross-appellant.

Before THORNBERRY, GARWOOD, and HILL, Circuit Judges.

GARWOOD, Circuit Judge:

In this Louisiana diversity case, defendant-appellant Falstaff Brewing Corporation challenges a judgment for damages against it for its breach of a sublease. Falstaff maintains that the district court, which refused to give Falstaff's proposed instruction, improperly instructed the jury on the issue of consent to confection of the sublease; that the court abused its discretion by refusing to give proposed instructions on conditions precedent, implied conditional offer, and suspensive condition, and by denying post-verdict trial amendments which alleged matters of affirmative defense, including prescription; and that the magistrate's initial recommendation, in the damages phase of the trial, of zero damages was proper as a matter of Louisiana law. Trinity Carton Company, Inc., plaintiff below, cross-appeals, complaining of the district court's failure to award it damages for Falstaff's breach of its obligation to purchase a trash baler under the terms of the contract to sublease.

We hold that neither the district court's refusal of Falstaff's trial amendments and proposed jury instructions, nor its refusal to give verbatim Falstaff's proposed instruction on consent, constituted an abuse of the court's discretion. We agree with the district court that the magistrate's finding of zero damages was improper as a matter of law. On the cross-appeal, we hold that Falstaff is liable to Trinity under their agreement for the purchase of the baler. We therefore affirm the district court's judgment in all respects, except insofar as it contains no award to Trinity for the purchase of the baler; and consequently we remand with instructions to the district court to reform its judgment accordingly.

## FACTS

In 1964, Falstaff subleased from Trinity [1] the premises adjacent to Falstaff's New Orleans brewery, upon which it erected and operated a can handling facility. The property of which this subleasehold was a part was leased to Trinity by its owner, Broad Street Corporation.[2] In the latter half of 1969, Falstaff sought to sublease the re-

---

1. This sublease (the "1964 sublease") was dated June 5, 1964, and was signed by the parties on July 29, 1964. It was to run for a term of twenty-five years commencing January 1, 1964, and ending December 31, 1988, with options to renew for successive terms of ten and five years. Its term was coincident with the term defined in the base lease between Trinity and the owner-lessor, Broad Street Corporation. The 1964 sublease leased to Falstaff 37,410 square feet out of the base leasehold. The terms of the 1964 sublease were for a specified "net" rental to be paid to Trinity; and for Falstaff to assume all costs of taxes, insurance, utilities, maintenance, and repair, etc. One clause provided for Trinity's election to cancel the sublease, or to demand accelerated payment in full of the rents for the term of the sublease, upon Falstaff's default. Falstaff was to "maintain property in good condition; to make at its own expense all repairs of any kind ... it being understood, however, that any structural alterations shall be subject to the approval of the Lessor [Trinity] and Broad Street Corporation."

2. The property was originally leased to Trinity by Broad Street by instrument dated July 1, 1961, with a five-year term to run until June 30, 1966. Pursuant to Falstaff's request for a longer term in its 1964 sublease, Emmett Meyer, President of Trinity, sought and obtained a new base lease with a considerably longer term, which superseded the 1961 lease.

The new base lease provided, *inter alia*, for a term of twenty-five years, to begin on January 1, 1964 and to end on December 31, 1988, with options to Trinity for renewal for successive periods of ten and five years; and for Trinity's right to sublease in whole or part for legitimate commercial purposes. It gave express approval of the 1964 sublease from Trinity to Falstaff, and a copy of that sublease was annexed to and made a part of the base lease. Broad Street further agreed expressly to "accept and approve any other subleases between Lessee and Falstaff ... for additional space provided it is not less than the rate basis and terms and conditions as the lease hereto annexed." This clause was inserted at Falstaff's request to Trinity. This new lease also contained a clause entitled "Lessee's Rights for New Construction," obtained by Meyer at Falstaff's request, which read:

"Lessee shall have the right to demolish any portion of the present improvements, provided Lessee builds, at his expense, any improvements thereon that are comparable or better insofar as the appearance, construction and utilitarian value are concerned. Demolition and erection of improvements are to be approved by Lessor, in writing, prior thereto."

mainder of the Trinity leasehold, with the intention of demolishing the existing improvements and building a can manufacturing plant. In October 1969, Trinity and Falstaff began discussions, but were unable to agree upon a price. Trinity, acting through its New Orleans attorney, Russel Schonekas, desired a net rental[3] at an annual rate of $1.20 per square foot, while Falstaff was willing to offer only in the range $.60 to $.65 per square foot net. Negotiations remained stalemated until an April 13, 1970 telephone conversation in which James S. McClellan, Falstaff's general counsel and a member of its Board of Directors, made what he characterized as Falstaff's final offer, for $.65 per square foot net. Schonekas asked that McClellan put this in writing, and received from McClellan the following letter, dated April 14, 1970:

"Confirming our telephone conversation yesterday, Falstaff will take a sublease from Trinity Carton Company of all the property heretofore leased from Broad Street Corporation by Trinity Carton Company other than the property heretofore subleased to Falstaff. The rental offered is $.65 per square foot net.

"Falstaff will purchase the bailer [sic] for $10,000, or it may be removed if your people so elect.

"I will appreciate it if you will call me after a decision has been made. Because of pending negotiations with regard to the other property,[4] it is necessary that I put a deadline of Monday, April 20, 1970, on the proposal herein made. If you can, however, I would greatly appreciate your calling me before that time.

"In the event your people decide to accept this proposal, we would like to move immediately on the consummation of the transaction."

Construing this to be a firm offer of sublease, Schonekas urged and obtained Trinity's approval of sublease at this net rental. Schonekas sent McClellan an acceptance telegram on April 20, 1970, reading:

"Terms of lease outlined in your letter of April 14th 1970 are acceptable to Trinity. Await review of lease if prepared by you."

After receiving the telegram, McClellan telephoned Schonekas in New Orleans that afternoon. According to Schonekas' testimony, the discussion proceeded as if a sublease agreement had been consummated with all terms other than the amount of the net rent to be identical to those contained in the parties' 1964 sublease. McClellan, however, testified that only the amount of the net rent had been discussed and agreed upon, and that there could be no confection of any sublease obligation until and unless written consent for Falstaff's demolition plan was obtained from Broad Street, and the sublease had been reduced to writing and signed.

Without consulting Schonekas or Trinity, McClellan instructed Falstaff's New Orleans counsel, Lawrence J. Moloney, to seek written consent from Broad Street for Falstaff's proposed demolition. Because the existing building had value as a depreciation tax deduction, Broad Street required a payment from Falstaff of $241,000 before it would give consent. Falstaff refused, and Moloney informed Trinity and Broad Street that the sublease deal was off.

Nonetheless, Trinity felt that a binding sublease had been confected, and Schonekas so advised McClellan in a letter dated May 8, 1970.[5] McClellan responded by let-

---

**3.** The term "net rental" was used to mean that the rental rate quoted would be "net" to sublessor Trinity, that is, free of all costs of repair, maintenance, taxes, insurance, etc., with those items to be borne by the sublessee.

**4.** This plainly referred to an unidentified property which McClellan had previously informed Schonekas Falstaff was negotiating to acquire (by lease or otherwise) for the same purpose as

the property it was seeking to sublease from Trinity, so that if Falstaff acquired the other property it would not be interested in the Trinity property.

**5.** Demand was also made for the first semi-annual rent installment to be timely paid on June 1, 1970. Schonekas indicated that, should Falstaff fail to tender such payment, Trinity would consider it to be in default, and would, accord-

ter dated May 13, 1970, denying that a sublease existed, and asserting: "As you have known from the outset of our negotiations ... the subleasing of this property by Falstaff was conditioned upon the obtaining of [Broad Street's demolition] approval." [6]

Trinity filed this diversity suit in the district court below in December 1973, alleging breach of a sublease contract, and seeking accelerated rents for the term of the sublease, consequential expenses, including costs of renovation necessary to place other tenants in the premises in mitigation of damages, and the purchase price of the baler. The liability phase of the case was tried to the jury, which returned a general verdict for Trinity. Three months later, Falstaff offered several trial amendments, most in the nature of affirmative defenses; leave to file all but one, for setoff, was denied by the district court.

The district court referred the question of damages to a magistrate, who returned a recommendation of zero damages. The district court refused to accept this recommendation, characterizing it as overturning the jury's verdict on liability. The magistrate's second recommendation assessed damages of $1,011,913.33. The district court accepted most of these recommendations with minor adjustments, for a total of $1,055,549.76, together with interest and ten percent attorneys' fees. The court did not, however, assess the purchase price of the baler against Falstaff, though the net damages reflected credits to Falstaff for $6,594.20 in baler rents.

### THE ISSUE OF CONSENT

The essential contest on liability was whether a binding oral sublease was in effect between Trinity and Falstaff in May 1970. The jury's verdict was for Trinity, and hence determined that such a sublease was in effect. Falstaff attacks this result by two main objections, although it does not challenge the sufficiency of the evidence or the jury's verdict *per se*. First, Falstaff asserts that the district court abused its discretion when it failed to give Falstaff's proposed instruction on consent, because the court thereafter inadequately instructed the jury on the Louisiana law of confection of obligations. Falstaff also claims that the district court overemphasized the question of whether the agreement was to be confected orally or by a writing, and that such emphasis confused or misled the jury about the consent issue.

Falstaff's second line of attack respecting the consent question is an assertion that the district court abused its discretion by refusing, first, to give Falstaff's proposed jury instructions on implied conditions, conditional offers, conditions precedent and suspensive conditions, and, second, by denying Falstaff leave to file its proposed post-verdict amendments to its pleadings. Our disposition of these second points is procedural, and is discussed below separately.

■ **A. The District Court's Instructions to the Jury.** We turn first to adequacy of the district court's instruction to the jury on the issue of consent. The Louisiana law of obligations provides that no contract is properly confected without the consent of both parties to all essential terms of the contract. LSA–C.C. art. 1766; *see also N–Y Associates, Inc. v. St. Charles Parish Policy Jury*, 422 So.2d 520 (La.App.1982); *Woodward v. Barringer*, 24 So.2d 200 (La.App.1945). Neither party disputes that there was agreement as to price. Falstaff's position was that no other

---

ing to the acceleration clause in the (1964) sublease, demand payment of all rents due for the entire term. Schonekas also made reference to Falstaff's obligation to purchase the baler for $10,000.

**6.** McClellan reiterated Falstaff's position that prior conversations had concerned primarily, if not exclusively, the question of the amount of net rent, and never addressed other material terms. He also asserted that "[i]t was the contemplation of the parties that the [sublease] would be evidenced by a sublease agreement. No such agreement has been executed and, since Falstaff is unable to make use of the property, there is no purpose in proceeding further."

material terms of the sublease, including duration, were ever discussed or agreed upon, and that no obligation could be confected until, in accordance with the intent of the parties, the sublease was reduced to writing and signed. Trinity's position was that it was understood, and at one point expressly discussed, that the other terms, including duration, would track those terms agreed upon and embodied in the parties' 1964 sublease; and that the course of the negotiations, considered in the context of prior oral contracts between the parties,[7] clearly showed that, although the parties contemplated reduction of the agreement to writing, such writing was only meant to commemorate their oral agreement. There was evidence to support both Falstaff's and Trinity's positions.

■ The district court's instructions to the jury formulated the consent issue in two ways. First, the jury was told it must determine whether the parties mutually intended to be bound by the sublease contract before, or not until, a formal written sublease was signed. The district court properly instructed the jury that, under Louisiana law, a valid oral contract could be confected where it was not the intention of the parties that an obligation obtain only upon execution of a writing. *See, e.g., Mermelstein v. Schwab*, 64 So.2d 37, 38 (La.App.1953). The question of whether the parties contemplated that a written sublease would merely commemorate the terms of their oral agreement, or whether such writing was a material prerequisite to the formation of the contract, was placed squarely before the jury.

■ Second, the district court instructed the jury that Louisiana law requires three things as absolutely necessary to the confection of an obligation: the thing, the price and consent. LSA–C.C. arts. 1766, 2670. It discussed contract formation by offer and acceptance. *See, e.g.,* LSA–C.C. arts. 1798, 1800, 1803. The court's instructions defined consent in the statutory language, *see* LSA–C.C. art. 1819, and clearly informed the jury that consent was in dispute between the parties, expressly indicating both Falstaff's contention that no consent had been given, and Trinity's contention that it had. The jury was instructed to focus on the intent of the parties in determining whether consent had in fact been given, including consideration of whether all the details and conditions material to the contract were agreed upon and understood by the parties, *see* LSA–C.C. arts. 1797, 1819, and the instructions informed the jury of the necessity of determining the intention of the parties with respect to the

---

7. The record shows that the parties had, on at least four prior occasions, confected oral agreements and acted in reliance upon them before they were reduced to writing and signed, even where they had an intention to reduce them to writing; and, on two of these occasions, despite an ultimate failure to execute any written instrument.

In the case of their 1964 sublease, the parties reached verbal agreement before December 20, 1963, prior to reduction of their agreement to writing. Then, at Falstaff's request, Emmett Meyer, President of Trinity, sought and obtained Broad Street's approval of Falstaff's demolition plans. Even so, Falstaff commenced its demolition and construction of a can manufacturing facility on or about January 1, 1964, the effective date of the sublease, *see* note 1 *supra*, in reliance only on a letter of approval of the proposed plans by the lessor, Broad Street. The sublease was not signed until July 1964.

In September 1967, pursuant to a verbal request by Falstaff, Meyer located and leased two warehouse storage bays in his name but on behalf of Falstaff. Without a written agreement (and despite the intent of the parties that this contract would eventually be reduced to writing), Falstaff timely performed its payment obligations and never raised the issue of lack of a written agreement. Similarly, in December 1967, again on verbal request and without the benefit of a written instrument, Meyer stored in his premises some of Falstaff's excess "jacketpaks." Meyer billed and was paid by Falstaff.

In August 1968, Meyer and a Falstaff official in St. Louis confected an oral agreement between Falstaff and Ringle & Meyer Corporation, which fabricated fiber cartons for Falstaff. The agreement, which replaced a prior contract, was to be effective on September 1 and was to be reduced to writing. This contract involved a die-cutting service by Ringle & Meyer for Falstaff on some 2,700,000 fiber cartons at a price of $81.00 per thousand, for a total cost of $218,700. It was commemorated, however, only by a letter from Falstaff's Warren Mathews to Meyer, dated September 12.

importance of a written sublease. The jury was instructed that it could consider prior dealings and contracts made previously between the parties,[8] the size and value of the proposed sublease at issue, and whether Falstaff considered or believed that the contract of sublease would not be confected unless and until written consent of Broad Street for demolition had been obtained.

After careful review of the district court's instructions to the jury, we conclude that the court made no substantive error of Louisiana law; neither were its instructions unclear or otherwise faulty or insufficient on the question of consent. It is clear that the district court's instructions placed before the jury the relevant substantive issues relating to the question of consent, and that the court fairly and clearly informed the jury of the requirements of Louisiana law. Falstaff's proposed instruction said nothing material that was not adequately covered by the instructions given. In these circumstances, the district court's decision not to give verbatim Falstaff's requested instruction on consent was not an abuse of its discretion.[9] *Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897, 902 (5th Cir.1970).

**B. The Question of Term.** Falstaff asserts that the jury charge and verdict establish only that consent to the contract was given; that the term of duration of the sublease was never litigated; and that there is no express finding of term by the district court. Falstaff thus claims that the jury's general verdict is insufficient to allow the court to fix damages.

The district court's instructions to the jury clearly indicate that a determination that the parties intended the nonprice material terms of the.sublease contract to be identical to those embodied in their prior 1964 sublease was essential to a finding that there was consent to the sublease.[10] Falstaff made no objection to the charge on the ground that it did not adequately cover this matter; nor did it tender any requested charge thereon. The record of trial indicates that this question was indeed litigated conspicuously as an essential component of the claimed consent. Plainly, both parties, the court and the jury all understood that if there was not an agreement on the basis of all the terms, other than the net rental rate, of the 1964 sublease, then there was no agreement. Thus, the jury's verdict determined that Falstaff consented to all material terms of the contract, including nonprice terms identical to those contained in the 1964 sublease. Falstaff's complaint that no term of sublease was determined is rejected. *See Bank of America National Trust & Savings Association v. Hayden,* 231 F.2d 595, 602 (9th Cir.1956). *Cf.* Fed.R.Civ.P. 49(a) (implied trial court findings in support of judgment where issues omitted from special verdict or interrogatories without objection).

---

**8.** The Louisiana Code indicates that
"[t]he proposition as well as the assent to a contract may be express or implied:
"Express, when evinced by words, either written or spoken;
"Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent." LSA–C.C. art. 1811.
The language of LSA–C.C. art. 1816 is similar: "Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract ...." *Cf.* LSA–C.C. arts. 1813–15. Analogy may be made to the common law contract implied in fact, resting upon consent implied from facts and circumstances that reflect a mutual intention to contract. *See also V–8 Taxicab Service, Inc. v. Hayes,* 322 So.2d 442 (La.App.1975).

**9.** In this context, we note that Falstaff's counsel pointedly announced immediately after the instructions had been given and before the jury began its deliberations that he had no objection to the charge as given, although he did protest the court's refusal to give his requested instructions.

**10.** The court told the jury, "Trinity contends that ... it was agreed and understood that the additional terms would be the same as those in the 1964 sublease." And later, the jury was told, "You are to decide if all the terms, that is, the details and conditions, were agreed upon and understood by the parties so that there was a complete contract ...."

## THE REQUESTED JURY INSTRUCTIONS

Falstaff asserts that there is evidence that the existence of an implied condition precedent was impressed upon the sublease negotiations. It maintains that, because Trinity knew precisely of its plan to demolish existing buildings and erect a can manufacturing plant and that Broad Street's permission would be necessary thereto, consent to the sublease could be found to have been conditioned upon obtaining that permission. It asserts that such a condition could be found to be implied by the very structure of the negotiations, "from the nature of the contract, or from the presumed intent of the parties." LSA–C.C. art. 2026. Thus, Falstaff sought jury instructions on conditions precedent, conditional offers, including implied conditions, and suspensive conditions,[11] and urges that it was an abuse of the district court's discretion to refuse to give such instructions.

■■■ A denial that a condition precedent occurred must be specifically and particularly pleaded, Fed.R.Civ.P. 9(c); *see* *also Sam's Style Shop v. Cosmos Broadcasting Corp.*, 694 F.2d 998, 1004 (5th Cir. 1983); *EEOC v. Klingler Electric Corp.*, 636 F.2d 104 (5th Cir.1981), and such matters may not be raised by a general denial.[12] Falstaff did not plead these matters in its answer or any amendment thereto. Nor was this issue tried by consent, *see* Fed.R.Civ.P. 15(b); *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 257 n. 4 (5th Cir.1981), for that requires that the parties actually recognize the issue to have been litigated.

■■■ Falstaff asserts that "[t]he Trial Judge knew or should have known from the Pre-Trial Order, that the sub-lease was subject to a condition, *i.e.*, prior written consent to demolition by the landowner as required in the base lease between Broad Street and Trinity." But, after a careful reading of the pretrial order, we conclude that the issue of condition precedent (or suspensive condition) was contemplated only in the context of whether Falstaff had given its consent to the confection of the sublease.[13] Certainly the language of McClellan's April 14 letter to Schonekas

11. LSA–C.C. art. 2021 states:
 "Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happened, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition."

12. LSA–C.C.P. art. 857 imposes a similar requirement. A party relying on suspensive condition to an obligation as a defense bears the burden of proving the existence of the parties' agreement on the condition and the failure of its occurrence. *Sam's Style Shop*, 694 F.2d at 1004; *see also F.C. Williams Real Estate v. Haydel*, 364 So.2d 171, 172 (La.App.1978); *Dales Jewelers, Inc. v. Rice*, 316 So.2d 416, 417 (La. App.1975). In this diversity suit, we apply the Louisiana law respecting the burden of proof (though pleading is a matter of federal law). *See, e.g., Cities Service Oil Co. v. Dunlap*, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939).

13. The pretrial order controls the course of the trial, Fed.R.Civ.P. 16; *Hodges v. United States*, 597 F.2d 1014, 1017–18 (5th Cir.1979), and a court need not consider matters not contained therein except to prevent manifest injustice. Amendments or objections thereto are required or else a litigant is barred from raising the matter on appeal. *Labbee v. Roadway Express, Inc.*, 469 F.2d 169, 172 (8th Cir.1972); *Hodgson v. Humphries*, 454 F.2d 1279, 1281 (10th Cir. 1972); *Fernandez v. United Fruit Co.*, 200 F.2d 414 (2d Cir.1952), *cert. denied*, 345 U.S. 935, 73 S.Ct. 797, 97 L.Ed. 1363 (1953). An attempt to pursue an issue not contained in the pretrial order may be rejected by a trial court, and the court may properly refuse to give an instruction on that issue. *Flannery v. Carroll*, 676 F.2d 126, 129, 130 (5th Cir.1982); *Allen v. U.S. Steel Corp.*, 665 F.2d 689 (5th Cir.1982). Such refusal is within the trial court's discretion, *Flannery*, 676 F.2d at 130; *Bettes v. Stonewall Ins. Co.*, 480 F.2d 92 (5th Cir.1973); *Pacific Indemnity Co. v. Broward Co.*, 465 F.2d 99 (5th Cir.1972). Even though amendment of the pretrial order may be allowed where no surprise or prejudice to the opposing party results, where, as here, the evidence and the issue were known at the time of the original pretrial conference, amendments may generally be properly refused. Each party has an affirmative duty to allege at the pretrial conference all factual and legal bases upon which the party wishes to litigate the case. *See* 6 Wright & Miller, *Federal Practice and Procedure* § 1527. Failure to do so may implicate waiver of the issue at the discretion of the trial court, subject to considerations of fairness and efficient administration of the trial.

makes no express reservation of Falstaff's consent to the formation of the sublease, upon either the reduction to writing of the agreement, or of obtaining prior permission from Broad Street to demolish. The language of that letter is couched in terms that constitute a firm offer; Trinity interpreted the letter in that way, and timely accepted.

 The record reveals that the question of condition was litigated within the framework of the issue of consent. Trial by consent may not be deemed where evidence concerning the issue that is maintained to have been thusly tried is also relevant to other issues that in fact have been pleaded and tried, at least in the absence of clear notice that such issue was being raised. *United States v. State of Texas*, 680 F.2d 356, 361 (5th Cir.1982); *International Harvester Credit Corp. v. East Coast Truck*, 547 F.2d 888, 890 (5th Cir.1977). Where prejudice would result to deem the issue to have been tried by consent, and especially where there would be no opportunity for the opposing party to adequately prepare to meet the unpleaded issue, courts will refuse to deem the pleadings amended. *Combee v. Shell Oil Co.*, 615 F.2d 698 (5th Cir.1980). Falstaff did not plead nonoccurrence of such a condition, and it litigated this question as one of fact embedded in the consent issue. The district court did not abuse its discretion by refusing to give these requested instructions.

## THE POST–VERDICT TRIAL AMENDMENTS

 Falstaff also complains that it was an abuse of the district court's discretion to deny its post-verdict proposed pleading amendments. Falstaff, several months after return of the jury's verdict, requested variously to amend its original answer to include: the defense of condition precedent, LSA–C.C. art. 2043 (*see also* LSA–C.C. arts. 2021, 2028); failure to agree on all essential elements of the obligation, *see* LSA–C.C. art. 1819; absence of cause (failure of consideration), LSA–C.C. arts. 1893, 1896–97; allegation that, under LSA–C.C. art. 2685, the absence of an express determination of the term of the lease implied a month-to-month lease only, which Falstaff by its letter dated May 13, 1970, gave sufficient notice to terminate, *see* LSA–C.C. art. 2686; the defense of prescription,[14] LSA–C.C. art. 3538; and an allegation of setoff for the rents of sublessees in occupancy of the premises. The district court denied leave to file all but the last of these, none of which were proposed until over three months after the jury's verdict on the issue of consent and liability had been entered.

 The Federal Rules of Civil Procedure require that such defenses "shall be set forth affirmatively." Fed.R.Civ.P. 8(c).[15] A general denial does not serve to

---

**14.** Prescription is a peremptory plea under Louisiana law. LSA–C.C.P. art. 927. It "may be pleaded at any stage of the proceeding in the trial court *prior to a submission of the case for a decision* ...." LSA–C.C.P. art. 928 (emphasis added). If later pleaded, it *may* be remanded to the trial court for a trial of the exception, LSA–C.C.P. art. 2163, but need not be considered by the appellate court. *Cf. Succession of Douglass,* 225 La. 65, 72 So.2d 262, 264 (1954). Falstaff's assertion that it could by right plead this defense at any time, including following the jury's verdict on liability, overstates Louisiana law, *see Merchants Adjustment Bureau v. Malta,* 102 So.2d 781, 783–84 (La.App.1958), at least in the context of constructing an analogy appropriate to federal procedure, which does not employ the Louisiana scheme of pleaded exceptions. The issue of liability, upon which a plea of prescription is peremptory if accepted, was submitted to

the jury "for decision"—binding in the federal courts if supported by substantial evidence and if no mistake of law has occurred—prior to Falstaff's proffer of its trial amendments. Under Fed.R.Civ.P. 8(c), prescription is a defense which must be affirmatively pleaded; thus, contrary to Falstaff's urging, Louisiana law on this point is neither conclusive nor persuasive in this diversity case, where Falstaff did not timely plead this affirmative defense. *See Combee,* 615 F.2d at 700.

**15.** We note that Fed.R.Civ.P. 8(e)(2) allows the pleading of affirmative defenses in the alternative with a general denial. We note also that LSA–C.C.P. art. 1005 requires that a defendant's answer set forth affirmatively any matter constituting an affirmative defense. Article 1006 allows pleading of alternative defenses, even

raise such defenses. *Jackson v. Seaboard Coastline R.R. Co.,* 678 F.2d 992, 1010–11 (11th Cir.1982). Failure to plead such defenses may implicate a waiver and the subsequent exclusion of those defenses from the case. *Combee,* 615 F.2d at 700; *Henry v. First National Bank of Clarksdale,* 595 F.2d 291, 298 n. 1 (5th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980).

Of course, the requirement that affirmative defenses be pleaded or waived must be applied in the context of the Federal Rules' liberal pleading and amendment policy, the goal of which is to do substantial justice. Falstaff had under Fed.R. Civ.P. 15(a) an automatic amendment period of twenty days following the filing of its original answer, during which time it could have amended its pleadings as of right. After the expiration of this period, or after the filing of a responsive pleading, leave to amend was within the district court's discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 329–31, 91 S.Ct. 795, 801–02, 28 L.Ed.2d 77 (1971); *Hall v. Aetna Cas. & Sur. Co.,* 617 F.2d 1108, 1110 (5th Cir.1980). Refusal of leave to amend is reviewable on an abuse of discretion standard. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); *Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541, 546 (5th Cir.1983). Discretionary denial of leave to amend must be based on a "substantial reason," *Wedgeworth,* 706 F.2d at 546; *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 598 (5th Cir. 1981), including undue delay,[16] bad faith or dilatory motive, or undue prejudice to the opposing party. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *Dussouy,* 660 F.2d at 597–98 (5th Cir.1981). Post-verdict or -judgment amendments are occasionally allowed, but where they may substantially prejudice

the other party or are merely the result of a long and unreasonable delay, particularly if the movant was aware of the facts upon which the amendment is predicated and could have raised the matter before judgment, such amendments properly may be denied. *Union Planters National Leasing, Inc. v. Woods,* 687 F.2d 117, 121 (5th Cir.1982); *see also Combee,* 615 F.2d at 700.

Falstaff did not previously plead or otherwise raise, as by motion or in the pretrial order, any of the matters contained in its post-verdict proffered pleading amendments. It necessarily was put on notice by the very nature of the suit that these matters of affirmative defense would be relevant to, if not potentially controlling of, the determination of liability. Falstaff makes no claim, and the record does not suggest, that it was unaware of any facts which form the bases of these defenses; nor does Falstaff offer any excuse beyond an assertion made at oral argument, which, when unveiled, is only that it did not expect to lose. It chose to postpone assertion of these grounds of defense over three years after the suit was filed, and nearly three and one-half months after the jury's verdict assessing liability had been entered. There is simply no justification for such delay. This Circuit has expressly disallowed the use of seriatim theories of defense. *Union Planters,* 687 F.2d at 121; *Freeman v. Continental Gin Co.,* 381 F.2d 459, 469–70 (5th Cir.1967); *see also Ford Motor Co. v. Auto Supply Co., Inc.,* 661 F.2d 1171, 1172 (8th Cir.1981) (post-summary judgment motion to amend answer denied when it was "transparent attempt to manufacture a defense after [defendant's] liability had already been established"). Under these circumstances, it worked no miscarriage of justice, nor was it an abuse of the district

---

where they are factually or legally inconsistent or mutually exclusive.

**16.** The proposed amendment must be timely: it must not have been delayed solely for the purpose of gaining a tactical advantage. *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1163–64 (5th Cir.1982). Undue delay alone may be sufficient to foreclose amend-

ment. *Dussouy,* 660 F.2d at 598–99. *See also, Chitimacha Tribe,* 690 F.2d at 1163; *Morgan Guaranty Trust Company of New York v. Blum,* 649 F.2d 342, 345 & n. 4 (5th Cir.1981); *Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir.1981); *Dave v. Payless Cashways, Inc.,* 612 F.2d 1022, 1025 (5th Cir.1981).

court's discretion, to deny Falstaff's belatedly proposed pleading amendments.

## THE QUESTION OF DAMAGES

■■■ Falstaff asserts that the magistrate's initial finding of a zero quantum of damages was proper as a matter of Louisiana law. The district court correctly refused to accept these findings. Falstaff's assertion that it was denied possession of the premises, and that Trinity hence breached the sublease and discharged Falstaff, is not a question properly to be considered in a determination of the quantum of damages. It is instead, as the district court correctly described it, quite clearly a matter of affirmative defense on the merits, addressing the issue of liability. Falstaff never pleaded such defense (and it was not even included in the proffered post-verdict amendments) as it was required to do, Fed.R.Civ.P. 8(c); *Tomlin v. Ceres Corp.*, 507 F.2d 642, 647 (5th Cir. 1975), and it was not raised in the pretrial order. Liability on the merits was the matter tried to the jury, and its verdict was against Falstaff. Thus, any defense on the merits was concluded adversely to Falstaff. *See Bank of America National Trust & Savings Association v. Hayden*, 231 F.2d 595, 602 (9th Cir.1956). All that was referred to the magistrate was the quantum of damages. The magistrate therefore acted outside his authority, and went beyond the scope of his instructions from the district court, in making the finding of zero damages based on the theory that Falstaff was denied possession.[17]

■■■ The district court, after refusing to accept the magistrate's initial ruling, again referred the question of damages to the magistrate, who then determined that Falstaff owed Trinity damages in the amount of $1,011,913.33, including accelerated rents for the entire term of the sublease,[18] maintenance and repair to the existing buildings, and costs of insurance, taxes, and the like, as required by the sublease, and giving Falstaff credit for rents received from substitute tenants (including rents from use of the baler). This

17. The magistrate applied the following reasoning: Trinity, ostensibly to mitigate damages occasioned by Falstaff's breach, sublet the premises to alternative tenants. This act, and the performance of renovations necessary to obtain the tenants, which altered the premises contrary to Falstaff's announced needs, under Louisiana law effected a dispossession of Falstaff from the premises. The magistrate concluded that, as of the first day of the sublease, Trinity had breached the sublease and that Falstaff therefore owed Trinity no damages.

The magistrate may have reached this conclusion upon a misapprehension of the evidence. He apparently based his conclusion that Trinity had sublet the premises to a replacement tenant effective the first day of the sublease's term by virtue of Trinity's accounting sheet entry crediting rents from "Letellier-Phillips" for a period that began with the first month of the term of the sublease. These rents were in fact obtained, not for sublease occupancy of the premises, but for the use of Trinity's trash baling machine. Trinity apparently presented those rents as credits to Falstaff in its pleadings and evidence because it assumed that a finding that Falstaff was liable upon the sublease obligation would include Falstaff's obligation to purchase the baler as ·agreed, and that, having done so, such rents would properly need to be credited to Falstaff. In fact, Trinity did not place alternative tenants

in possession as sublessees until seven months following the starting date of the sublease. Thus, even should the magistrate's factual conclusion give rise under Louisiana law to a valid defense to liability on the merits for Falstaff, a point upon which we do not express an opinion, nevertheless the magistrate's determination that Trinity prevented Falstaff from taking possession is clearly erroneous.

18. We note that anticipatory repudiation is actionable under Louisiana law. *Marek v. McHardy*, 234 La. 841, 101 So.2d 689 (1958). A lessor may, where appropriate, act to mitigate damages. *Overmeyer Co. v. Blakeley Floor Covering, Inc.*, 266 So.2d 925 (La.App.1972). We note also that assessing rents for the entire duration of a lease as yet unexpired may be so severe as to be punitive. *See Chapman v. Capri Construction Co.*, 248 So.2d 101 (La.App.1971). But Falstaff has never (at trial or on this appeal) objected to the damages assessed on any such ground (and we express no opinion in this regard), and Trinity conceded at oral argument that, having in essence paid the rents in full for the entire term of the sublease in advance, Falstaff will (at least on payment) be entitled to possession of the sublease premises for the entire remaining term of the sublease, subject only to any existing unexpired subleases obtained by Trinity in its mitigation efforts. Falstaff will also, of course, be entitled to receive the rents therefrom.

recommendation did not include liability for the purchase price of the trash baler, nor costs of renovation necessary to Trinity's mitigation efforts or financing costs therefrom, these latter exclusions again having been made by the magistrate on the basis that Trinity acted against Falstaff's expressed need to demolish by performing such renovation. The district court accepted most of these findings, but allowed costs of renovation and financing charges therefor, thereby increasing the net damages to $1,055,549.76, plus attorneys' fees of ten percent on the whole of the award, interest included, with interest calculated from the date each item became due. Apart from Falstaff's claim, which we have rejected, that the magistrate's initial determination of zero damages was correct, neither party has objected on appeal to any of these findings of damage, except for Trinity's cross-appeal concerning the purchase of the trash baler. Consequently, on all points of damage contained in the district court's judgment, with the sole exception of the matter of the trash baler, addressed below, we affirm that court's judgment.

### THE TRASH BALER

 There is, on this record, no doubt that Falstaff agreed to purchase the trash baler for $10,000, as evidenced by its letter of April 14, 1970 from McClellan to Schonekas. Nor does Falstaff dispute that it so agreed. Testimony of Falstaff's witnesses indicates, to the contrary, that it intended to honor its offer to purchase the baler, subject only to the confection of a sublease agreement with Trinity. The jury's verdict establishes the existence of that sublease agreement, and, consequently, as a matter of law, the existence of Falstaff's obligation to purchase the baler.[19]

Because there are no issues of contested fact with respect to this purchase obligation, the price having been established by Falstaff's offer letter, we remand with instructions to the district court to reform its judgment to include in favor of Trinity additional damages of $10,000, plus interest at the legal rate from the date of the beginning of the term of the sublease.[20] Falstaff may, of course, keep the baler.

### CONCLUSION

In accordance with the foregoing, we affirm the district court's judgment in all respects save the quantum of damages. On this single point, we remand with instructions to the district court to reform its judgment to include the purchase price of the baler and interest thereon at the legal rate in the damages owed to Trinity by Falstaff.

**19.** The matter was pleaded in Trinity's initial complaint. The district court apparently determined that Trinity had waived the issue of liability for the purchase of the trash baler because it did not object to absence of instructions to the jury on this issue. But this was not a factually disputed matter. There was no need to submit it to the jury.

The record indicates that Trinity brought the baler issue to the attention of the court at every reasonable juncture, with sufficient detail to inform that court of the fact of and the basis for Trinity's position: Trinity raised the issue in its motion to oppose the magistrate's initial (zero) damages determination, and also pointed out the fact that the Letellier-Phillips "rents" credited to Falstaff were for use of the baler, and not for sublease of the subject premises. It raised this issue again in its objections to the magistrate's second damages determination. And although it did not raise the matter by a motion to reform the judgment or by its own motion for new trial following entry of judgment, Trinity did raise these points again in detail in its memorandum in opposition to Falstaff's motion for new trial. Finally, Trinity raised this point before this Court by cross-appeal.

The district court was adequately apprised of the nature of Trinity's assertions regarding the baler in a manner calculated to make the district court aware of the contention and the undisputed factual and legal basis therefor, and affording the court an opportunity to recognize and to correct any error.

**20.** Falstaff has already received credits in the amount of $6,594.20 for rents received from the use of the trash baler by "Letellier-Phillips." Any rents attributable to the baler and received by Trinity since the time this appeal was taken must, of course, be credited to Falstaff; likewise, any costs associated with maintaining the baler for Falstaff's ultimate benefit that have been incurred by Trinity since that time must be restored to Trinity. We note in passing that it was Falstaff's own trash upon which the baler was used.

The judgment of the district court is affirmed in all respects except as to the damages for the baler, as to which it is reversed and remanded. Accordingly, the cause is **REMANDED** to the district court with directions to reform its judgment in accordance herewith.