SAM'S STYLE SHOP, d/b/a Sam's Women's Apparel, Plaintiff-Appellee,

v.

COSMOS BROADCASTING CORPORATION, Defendant-Appellant.

No. 81–3296.

United States Court of Appeals, Fifth Circuit.

Dec. 28, 1982.

Stephen B. Lemann, Edward T. Meyer, New Orleans, La., for defendant-appellant.

Lawrence S. Kullman, New Orleans, La., for plaintiff-appellee.

Before RUBIN, RANDALL and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Cosmos Broadcasting Corporation appeals from a jury verdict casting it in damages for breach of a contract to televise commercials comparing the price of apparel sold by Sam's Style Shops with the price charged by other New Orleans retail stores. In this diversity case, governed by Louisiana law, Cosmos asserts that decisions of Louisiana intermediate appellate courts on the controlling legal issues are erroneous. We decline the invitation to appraise the Louisiana courts' knowledge of the Louisiana Civil Code and, on that basis, to reverse the district court's legal conclusions. Because the judge's instructions were in accordance with Louisiana law, we affirm the judgment of the district court. However, the commercial cost only $2,500 to produce and was to be broadcast only twelve times for periods of thirty seconds each. We conclude that the award of $50,000 for the cost of the commercial plus lost profits is clearly excessive, and we reverse the judgment insofar as it denies a remittitur or a new trial on the issue of damages.

I.

Sam's is a Florida partnership engaged in selling women's clothing as a discounter, charging what it advertises to be a lower price than conventional retail stores. In 1977, Sam's management decided to run a television advertising campaign comparing its price for a specific garment with the price charged by a named competitor.

Sam's advertising representative, Craig Bourgeois, telephoned John Parham, sales representative for Cosmos' New Orleans affiliate WDSU. Both Parham and Bourgeois testified that they reached agreement on the sale of television time for the proposed comparative advertising campaign to Sam's,[1] and Parham sent Bourgeois a written confirmation of their conversation. This called for twelve commercials of thirty seconds each for a price of $2,400. Parham also testified, however, that he insisted on WDSU's right to screen, i.e., to review, the commercial before televising it. Bourgeois stated that he did not recall that condition.

Bourgeois then had the commercial prepared and sent it to WDSU. The station's management screened the commercial and declined to run it. Cosmos admitted that the quality of the advertisement was acceptable (it was "of broadcast quality") and that the commercial was neither obscene nor fraudulent. WDSU Sales Manager Levy testified that the difficulty with Sam's ad was the station's inability to verify the pricing claims.[2] General Sales Manager Wexo deposed that his decision not to run the commercial was based on his concern that it would confuse viewers. The station's general manager testified that he was troubled because the ad might be deceptive.

After Sam's rested, Cosmos moved for a directed verdict. It claimed that there was insufficient evidence to support a finding that the parties had contracted for WDSU to broadcast a particular commercial rather than merely to sell some commercial time units.[3] It also contended that, even if a contract to broadcast a particular commercial had been formed, subparagraph 8(d) of the confirmation order was a purely potestative condition permitting Cosmos to decide not to be bound by the agreement.[4]

1. Both Parham and Bourgeois testified that, when Bourgeois stated that Sam's desired to run comparative-price advertisements, Parham insisted on checking with his supervisor before making a commitment to accept the advertising. The supervisor approved the concept of televising such advertising on WDSU.

2. At oral argument Cosmos' counsel explained that the difficulty in verification arose from the nature of the commercials. Thus, Sam's could demonstrate that the prices were correct on the first day the commercial ran. But on the second day, the competitor named in the commercial might have cut the price on the item in response to Sam's advertisement. The station was unwilling to assume responsibility for occurrences after the commercial first ran.

3. This claim is not pursued on appeal, and we do not consider it.

4. A potestative condition "makes the agreement depend on an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder." La.Civ. Code Ann. art. 2024 (West 1977).

Reasserting the reasons given when the same issue had been raised in a motion for summary judgment, the district judge denied the motion on the ground that the condition was a "simple" rather than a "pure" potestative condition and prevented Cosmos from rejecting the commercial unless it had a reasonable basis, in accordance with objective standards prevailing in the television industry, for doing so. *See Sam's Style Shop v. Cosmos Broadcasting Corp.,* 496 F.Supp. 46 (E.D.La.1980). The jury found for Sam's and awarded $50,000 damages.

Cosmos' appeal challenges the judge's characterization of subparagraph 8(d) as a simple potestative condition, his instructions to the jury on the burden of proof, and the quantum of the damage award.[5]

II.

Cosmos first argues that subparagraph 8(d) operated as a purely potestative condition, preventing any contractual obligation from being formed until WDSU actually screened a commercial and accepted it.[6] Therefore, Cosmos contends that, even after agreeing to accept a certain type of commercial, it had the right to reject any particular ad submitted for any reason or for no reason at all.

Potestative conditions make the formation of an obligation depend entirely on the obligor's will. *See* La.Civ.Code Ann. arts. 2024, 2035 (West 1977). Yet there can also be conditions requiring "that the obligor shall do or not do a certain *act,* although the doing or not doing of the *act*

depends on the will of the obligor, yet the *obligation* depending on such condition, is not void." *Id.* art. 2035 (emphasis added). "The jurisprudence establishes that . . . those potestative conditions which are dependent solely upon the will, whim, or caprice of the obligor invalidate the contract. If the condition shows on its face that the obligor may or may not fulfill [its] obligation as per [its] desire, then the obligation is null." *Franks v. Louisiana Health Services & Indemnity Co.,* 382 So.2d 1064, 1068 (La. App.1980). That court continued:

> However, if the condition imposes on the obligor the duty of making a sincere effort to fulfill the obligation, then the fact that the obligor is in a position to hinder or prevent the execution of the contract does not make the contract null. . . . [T]he obligor has the duty to reasonably perform the condition which is a condition precedent to the obligation.

(citations omitted). In short, as the district court pointed out, a "simple" potestative condition suspends execution rather than formation of the obligation and requires the obligor to make a good-faith effort to carry out the obligation. *Sam's Style Shop,* 496 F.Supp. at 49. *See* M. Planiol, Treatise on the Civil Law vol. 2, No. 1269A, at 721 (11th ed. 1939) (simple potestative condition "consists in the happening" of a future *fact* dependent on one of the parties' will, such as, "I will sell you my house if I decide two years from now to transfer my domicile"); S. Litvinoff, Louisiana Civil Law Treatise vol. 6, § 25e, at 463 n. 36 (1966) (example of

---

Subparagraph 8(d) of the confirmation agreement reads:

> Television program and commercial material provided by AGENCY is subject to STATION approval and STATION may exercise a continuing right to reject such material, including a right to reject for unsatisfactory technical quality.
> In the event the program material is unsatisfactory, STATION shall notify AGENCY . . . .
> In the event the commercial material is unsatisfactory, STATION shall notify AGENCY . . . , and, unless AGENCY furnishes satisfactory material 24 hours prior to telecast time, this contract may be terminated by either party without penalty to either party.

5. This entire sequence of events was repeated in March, 1978, after negotiations between the parties. Sam's abandoned the 1978 claim at trial, and only the October, 1977, claim is before us.

6. If an agreement is subject to a purely potestative condition, there is no contract until the obligor affirmatively elects to be bound. At oral argument Cosmos' counsel stated that Cosmos' election would occur, and its obligation arise, when it actually broadcast the commercial.

purely potestative condition is A saying to B, "I promise to pay you $100 tomorrow, if I do not change my mind in the meantime").

■ Louisiana law does not favor the interpretation of contract conditions as purely potestative; instead, whenever possible agreements are to be interpreted to preserve their validity. *Schwegmann Brothers v. Calvert Distillers Corp.,* 184 F.2d 11, 14 (5th Cir.1950), *rev'd on other grounds,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); *see McTee & Co. v. Brown Funeral Home,* 183 So. 558 (La.App.1938) (in construing a contract the court will not presume that the parties intended to enter into a one-sided and nugatory agreement). Thus, in *Franks* the court held that a group health policy exclusion of hospital admissions found by the insurer not to be medically necessary was not a purely potestative condition. The clause stated: "Benefits are not provided ... when in the judgment of the Carrier the medical services did not require the ... hospital[ization] .... THE FACT THAT A PHYSICIAN MAY PRESCRIBE, ORDER, RECOMMEND, OR APPROVE A SERVICE OR SUPPLY DOES NOT, OF ITSELF, MAKE IT MEDICALLY NECESSARY." 382 So.2d at 1066. The court concluded that the insurer was obligated to make a sincere effort to determine whether hospitalization was necessary and to use medical experts in making that determination.

Similarly, in *Professional Billing Agency, Inc. v. Tarantino,* 350 So.2d 258 (La.App. 1977), the court held that a contract term stating: "[a]ssignee shall have the right to grant extensions and indulgences to accounts receivable debtors in its sole discretion ...." was not purely potestative. *Id.* at 261. The court concluded: "Clearly the performance of the contract is not dependent upon the sole will of the assignee.

Rather, plaintiff must act reasonably and make an effort to collect the accounts if his ... business is to be profitable. The extensions or indulgences contemplated in the agreement are those reasonable indulgences allowed by creditors." *Id.*

■ Recognizing these decisions, Cosmos contends that they are based on an erroneous interpretation of Louisiana law. It relies on Professor Vernon Palmer's article, *A Review of the Louisiana Law on Potestative Conditions,* 47 Tul.L.Rev. 284 (1973), proposing an interpretation argued to be more consonant with the text of the code articles. Cosmos contends that the Louisiana Supreme Court would adopt the view proposed in the article. Absent some indication from the Louisiana Supreme Court that the several cases decided by the state intermediate courts incorrectly interpreted the definitions of the types of potestative conditions, absent any change in legislation, absent any reason to disregard the *Franks* and *Professional Billing* decisions save the hypothesis that the appellate courts were misguided, we consider ourselves bound to follow these decisions by *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The condition in subparagraph 8(d) is similar to the clauses considered in *Franks* and *Professional Billing.* It impliedly imposes on the station the duty of making a good-faith judgment, based on industry custom or some other reasonable basis, whether a given program or commercial is acceptable. The station's explicit reservation of the right to reject for poor technical quality gives an example of the permissible grounds for declining to broadcast a commercial. But the clause does not give station management an absolute and arbitrary right to reject a commercial after it has agreed to accept such advertisements.[7] *See*

---

7. The Louisiana courts long ago interpreted a contract provision similar to that presented in this case. The defendant in a contract action contended that, because the contract gave it the right to reject any order, it was not liable to pay a commission on an order which it had failed to fill. The court stated:

This is based on the assumption that it was within the contemplation of the parties to this contract that shipping of the goods, when the time for shipment arrived, was to depend purely on defendants' sole will and pleasure and not on any exercise of judgment

S. Litvinoff, Louisiana Civil Law Treatise vol. 6, § 258, at 463 & n. 37 (1969) (unless one has expressed the will to set some limits, whether absolute or subject to some objective contingency, to freedom of action, there is no contract).

Cosmos argues that this interpretation of the clause improperly delegates its authority as a federal communications licensee to serve the public interest. *See Traweek v. Radio Brady, Inc.*, 441 S.W.2d 240, 242 (Tex. Civ.App.1969). It contends that interpreting the clause as anything other than a purely potestative condition permits the station no discretion to reject unsuitable material. We cannot agree. No delegation of power is involved when the station obligates itself to make a good-faith determination, based on reasonable grounds, whether the material is suitable. Indeed, subparagraph 10(c) of the confirmation agreement explicitly states: "STATION's obligations hereunder are subject to the terms and conditions of licenses held by it and to applicable federal, state, and local regulations." This preserves Cosmos' right to reject any ad that violates its licensing obligation, but no federal, state or local regulation forbidding ads of the kind proposed by Sam's has been cited to us.

The district court properly interpreted the clause in question so as to render it not purely potestative. It permits Cosmos to reject a particular commercial, even after agreeing to broadcast an ad of its type, if the tendered commercial is libelous, obscene, its broadcast would otherwise violate the law, or for any other good reason. The clause Cosmos drafted, however, does not permit it to reject a commercial simply because management has changed its mind. If the clause did this, Cosmos' written agreement would not have obligated the station at all and would have imposed duties only on its customer. Louisiana's courts have never interpreted a clause to permit such latitude absent explicit language to that effect, and we follow their lead.

### III.

The court charged the jury that Cosmos had the burden of demonstrating that its decision to refuse the commercial was reasonable and in accordance with objective standards prevailing in the television industry, therefore, permitted by subparagraph 8(d). Cosmos contends that this instruction contravenes the Louisiana rule that the plaintiff must prove all elements of the contract, including the breach.

As a general proposition, of course, the plaintiff has the burden of proving all of the affirmative elements of its case. "The breach of a contractual duty cannot be presumed." *Morgavi v. Mumme*, 270 So.2d 540, 542–43 (La.1972). It does not necessarily follow that the plaintiff bears the bur-

---

by separately approving or rejecting each particular order.

 This assumption is, in our opinion, wholly erroneous .... Any contract in which one of the parties is to be bound only on a condition, which for its happening depends solely upon the exercise of his own will, is null and void from the beginning.

 On the other hand, a conclusion reached in good faith by an exercise of judgment on a particular matter may be erroneous; but correct or incorrect, it is not dependent solely on one's own will or pleasure. Hence, a contract with a condition which depends on a bona fide exercise of judgment by one of the parties about some of the particulars, is not open to the objection that it depends on an event which it is within the power of that party to prevent. Nor will it be affected by the fact that such party can arbitrarily refuse to exercise his judgment thereon; the "power

to hinder," within the meaning of C.C., Art. 2024, means the lawful power and right under the spirit as well as the letter of the contract.

 ....

 So that under one interpretation the contract under consideration is void, and under another it is valid; but it is elementary that when a contract is capable of two interpretations, one of which will save it, and the other condemn it, that interpretation must prevail which will save the contract.

 We are, therefore, of the opinion that the parties to this contract, contemplated that the shipping of the goods should depend on a bona fide exercise of judgment by defendants, on each individual shipment, when the time for shipment arrived and not on the mere pleasure and caprice of the defendants. *Steppach v. S.E. Worms & Co.*, 7 Teiss. 214, 217–18 (La.App. Orleans Parish 1910).

den of proof on every issue that may arise in a suit for breach of contract. In contract-breach cases, as in civil cases generally, the burden of proof of the elements of recovery is on the plaintiff, but the defendant must prove affirmative defenses such as lack of capacity,[8] fraud,[9] mistake,[10] exoneration,[11] or exception or exclusion from the contract.[12]

These affirmative defenses, it will be noted, are different in nature. Some, like mistake, vitiate the existence of a contract. They are defects in the consensual understanding, the meeting of minds, necessary to the creation of a conventional obligation. Others, like exoneration or payment, acknowledge the existence of a contract but speak to the discharge of the obligation it creates.

■ One who relies on a suspensive condition has the burden of proving the existence of the condition and nonoccurrence of the event on which the obligation was conditioned. *F.C. Williams Real Estate v. Haydel,* 364 So.2d 171, 172 (La.App.1978); *Dales Jewelers, Inc. v. Rice,* 316 So.2d 416, 417 (La.App.1975).[13] This allocation of the burden is based on the rationale that the existence of a suspensive condition is in the nature of an affirmative defense, even though the nonfulfillment of such a condi-

tion prevents the very formation of a contract.

Potestative conditions can be either suspensive or resolutory depending on their meaning. *See* Palmer & Plauche, 47 Tul.L. Rev. at 303–06 (only suspensive potestative conditions void); M. Planiol, Treatise on the Civil Law vol. 1, part 1 Nos. 318–19, 325 (11th ed. 1939). Classification of the Cosmos condition as suspensive would not, however, determine allocation of the burden of proof, for, as we have seen, at least the burden of establishing some defenses that are affirmative in nature rests on the defendant even though the defense is by way of confession and avoidance.

Louisiana has little jurisprudence relating to formal rules for allocating the burden of proof largely because in Louisiana most civil cases have been tried to the court, following civilian tradition, and the civil jury trial has been a relative rarity until recent years. Guidance can, however, be found in general principles. Louisiana usually places the burden of proof on the party with the affirmative on an issue. The usual test to determine which side has the burden is to ascertain which party would be entitled to a verdict if no evidence were offered on either side of the issue. *Rayner v. R.J. Jones & Sons,* 182 So.2d 353, 359 (La.App.1966)

---

**8.** *First National Bank v. Williams,* 346 So.2d 257, 264 (La.App.1977); *see Cundick v. Broadbent,* 383 F.2d 157 (10th Cir.1967), *cert. denied,* 390 U.S. 948, 88 S.Ct. 1037, 19 L.Ed.2d 1139 (1968).

**9.** La.Civ.Code Ann. arts. 1881, 1882 (West 1952); *LaFleur v. Brown & McKenzie, Inc.,* 388 So.2d 854, 857 (La.App.1980) (party alleging fraud has burden of proof); *Matassa v. Temple,* 346 So.2d 803, 805 (La.App.) (same), *writ denied,* 349 So.2d 332 (La.1977); *see Classic Bowl, Inc. v. AMF Pinspotters, Inc.,* 403 F.2d 463 (7th Cir.1968).

**10.** La.Civ.Code Ann. arts. 1881, 1882 (West 1952); *Mel-Way, Inc. v. Wesley,* 290 So.2d 454, 456 (La.App.1974) (mistake, misrepresentation, or ill-practice).

**11.** La.Civ.Code Ann. art. 2232 (West 1952); *Rolf v. Lewis,* 165 So.2d 12, 14 (La.App.1964).

**12.** *Briley v. Union Nat'l Life Insur. Co.,* 215 So.2d 532, 533 (La.App.1968), *appeal after remand,* 246 So.2d 265, 266–67 (La.App.), *writ*

*denied,* 258 La. 769, 247 So.2d 865 (La.1971); *Holder v. Lockwood,* 92 So.2d 768 (La.App. 1957).

**13.** An obligation contracted on a suspensive condition depends either on a future and uncertain event or on occurrence of an event that has already happened but about which the parties have not learned. La.Civ.Code Ann. art. 2043 (West 1977). La.Civ.Code Ann. art. 2021 (West 1977) further states:

Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until an event happens, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition.

In this forum, Cosmos' insistence that *Haydel* and *Dales Jewelers* were wrongly decided is a tilt at a windmill. That argument should be addressed to the Louisiana Supreme Court.

(opinion on rehearing). *See generally* M. Planiol, Treatise on Civil Law vol. 2, No. 51, at 31–32 (11th ed. 1939) (burden of proving rests on party who alleges).

■ In this case, Sam's bore the burden of proving that a contract existed and that it was breached. In view of this, the district court correctly instructed the jury that Sam's bore the burden of proving the elements of the contract.[14] In short, the judge instructed the jury that, if it found that a contract to televise comparative price commercials existed between Sam's and Cosmos, Cosmos bore the burden of demonstrating that it acted reasonably and in accordance with industry standards, rather than arbitrarily, in rejecting the commercial. Sam's proof of a contract satisfied the judge and the jury. Certainly the fact that the commercial was never shown was sufficient to establish a breach by the station once the jury concluded, as it must have, that a contract existed. Thus, Cosmos' argument that the district court failed to place the burden of proving a breach on Sam's is unavailing.

At that point, had no evidence about the reasonableness of Cosmos' rejection been submitted, Sam's would have been entitled

to judgment. It had made out a prima facie case by proving the existence of the contract and a breach of that contract. It then fell to Cosmos to demonstrate that the breach was justified by proving that its rejection of the commercial was reasonable and in accord with industry standards. The judge so instructed the jury, and *Rayner* teaches that the instruction was correct.

### IV.

Cosmos finally attacks the jury's $50,000 damage award as excessive. We find this contention meritorious.[15]

The Supreme Court has assumed, but never explicitly decided, that appellate courts may review the size of a jury verdict without violating the seventh amendment. *Gruenthal v. Long Island Railroad Co.,* 393 U.S. 156, 158, 89 S.Ct. 331, 332, 21 L.Ed.2d 309, 312 (1968); *see id.* at 163, 89 S.Ct. at 335, 21 L.Ed.2d at 315 (Harlan, J., dissenting) ("at an utter loss to understand" how Court reviews damage award without deciding whether appellate courts may do so). We likewise assume that we may review the size of a damage award,[16] although this power is straitened. *Ross v. Newsome,* 289 F.2d 209, 210–11 (5th Cir.1961).

---

**14.** The instruction stated:

Should you decide that plaintiff, Sam's Style Shop, had carried its burden of showing ... that it entered into a contract with ... WDSU, for showing price comparison advertising then you must turn to the question of whether WDSU, in fact, breached that contract.

This Court has determined as a matter of law the condition contained in the sub-paragraph 8D of the agreement is ... a "simple potestative condition." This means that sub-paragraph 8D did not give the television station an arbitrary right to refuse to show particular commercials at its whim or for no reason. There is implicit in the meaning of subparagraph 8D a duty on the part of the station to act reasonably and in accordance with objective standards prevalent in the television industry in determining whether to run particular spots.

. . . .

You will recall that I previously instructed you that Sam's as the plaintiff ... has the burden of proving its claims by a preponderance of the evidence . . . . If it fails to do so

you must return a decision for the defendant, WDSU.

On the particular issue of the meaning of sub-paragraph 8D, however, the burden [is on Cosmos]. In other words, if you should find that the station agreed to show price comparison advertising but then refused to do so, the burden rests on the station to convince you ... that its decision to refuse the advertising was allowed under ... subparagraph 8D as I have just explained that to you.

**15.** We do not consider excessiveness of the verdict unless the issue is presented to the district court. *Baker v. Dillon,* 389 F.2d 57 (5th Cir.1968). The record makes clear that Cosmos presented the remittitur issue. The district court did not formally deny the motion but merely stated: "[T]hat's a very hard standard, that's very hard for me to do in this circuit."

**16.** All courts of appeals appear to recognize some power to review the size of damage awards. *See* 6A J. Moore, Moore's Federal Practice ¶ 59.08[6], at 59–177 to –187 (2d ed. 1982).

 In reviewing a jury award, we are actually, of course, reviewing the district court's denial of a motion for a new trial or remittitur. Because the district court has a wide range for discretion in acting on such motions, our standard of review is not simply right or wrong but abuse of discretion. *Menard v. Penrod Drilling Co.,* 538 F.2d 1084, 1088 (5th Cir.1976) (grave abuse of discretion); *Ward v. Buehler,* 472 F.2d 1170, 1171 (5th Cir.1973) (per curiam) (clear abuse of discretion). *See Pellegrin v. J. Ray McDermott & Co.,* 504 F.2d 884, 885 (5th Cir.1974) (per curiam) (grave abuse of discretion); *cf. Givens v. Lederle,* 556 F.2d 1341, 1346 (5th Cir.1977) (award constitutes clear abuse of *jury's* discretion).

 We have stated the test for this review in various ways, saying, for example, that there is no such abuse of discretion unless there is a complete absence of evidence to support the verdict. *See Vallot v. Central Gulf Lines, Inc.,* 641 F.2d 347 (5th Cir.1981) (per curiam); *Crador v. Louisiana Department of Highways,* 625 F.2d 1227, 1230 (5th Cir.1980), *cert. denied,* 452 U.S. 915, 101 S.Ct. 3048, 69 L.Ed.2d 417 (1981). We have also said that the verdict cannot be upset unless it is so excessive that no reasonable juror, unswayed by passion or prejudice, could have awarded that amount. *See Allen v. Seacoast Products, Inc.,* 623 F.2d 355, 364 (5th Cir.1980). At other times, we have articulated the question as whether the award was contrary to all reason. *See Menard,* 538 F.2d at 1088–89; *Machado v. States Marine-Isthmian Agency, Inc.,* 411 F.2d 584, 586 (5th Cir.1969). *See generally Wood v. Diamond M Drilling*

*Co.,* 691 F.2d 1165, 1168 (5th Cir.1982) (citing cases). Whichever way the test is articulated, before setting aside a verdict as excessive, we must make a detailed appraisal of the evidence bearing on damages and be satisfied that the award is completely without support in the record and evidences prejudice or speculation rather than a reasonable view of the evidence. *See Gruenthal,* 393 U.S. at 159, 89 S.Ct. at 333, 21 L.Ed.2d at 313. In this case, we conclude that, by any of the verbal standards we have stated, the verdict cannot stand.

 Sam's presented one witness, John Dunaway, to establish its damages. Dunaway described a survey he conducted comparing Sam's sales in markets in which it ran comparative advertisements with those in which Sam's did not broadcast such commercials.[17] He concluded that Sam's expenditure of a total of $2,400 in advertising charges, plus $2,500 to produce the commercials, would have increased its gross sales in New Orleans by $239,119 and its net profit by $57,000.[18] These data make it evident that the ratio of projected sales to the dollar of advertising expense would have been 100 to 1, and the ratio to total advertising cost, 50 to 1, a staggering return.

On cross-examination Dunaway conceded that he had not considered a number of factors in making his calculations. For example, he did not take account of the different period of time considered in New Orleans (October through December) and the rest of the cities (March through May). The latter period included the Easter holi-

---

17. Dunaway used sales figures from 1978, the year the commercials ran, and 1979, comparing areas where the commercial ran with areas where it did not run. His figures:

| | areas where ads ran in 1978 1979 sales | areas where ad did not run 1979 sales |
|---|---|---|
| 4 weeks after ad | – 32% | – 6% |
| 8 weeks after ad | – 10% | + 11% |
| 12 weeks after ad | – 9% | + 1% |

Thus, Dunaway concluded that the ads were responsible for a 32% sales increase during the first four weeks after the ad ran, a 21% increase in the second four weeks, and a 10% increase in the third four weeks. He applied these percentages to the sales at Sam's several New Orleans stores for the four, eight, and twelve weeks of 1977 following WDSU's failure to run the commercial.

18. Dunaway first arrived at an increased net profit of $87,000. He recalculated the figure, however, after Cosmos pointed out what Dunaway described at trial as "hurried numbers" in the calculation.

day, traditionally a heavy sales period in the women's apparel business. Furthermore, Dunaway included one newly opened store in calculating the total sales volume for the New Orleans stores, but excluded other newly opened stores from his survey data because of their distorting effect on sales figures.[19] Dunaway also failed to consider such factors as the number of television stations in the markets surveyed, the effect of radio and newspaper advertising, the amount of advertising run in all markets in 1979,[20] the number of days the comparative ads ran in the various markets, the number of competitors in the various markets and their advertising, and the population, income statistics, and socioeconomic mix of the markets where the ads ran compared to New Orleans. Finally, Dunaway did not take account of general economic conditions in 1979, which by his own admission was a "very poor year."

Cosmos presented two witnesses, each of whom emphasized the weaknesses in Dunaway's survey. They focused on such matters as gross television rating points in the communities in which the ads ran, which determine the advertiser's ability to reach its target market. They also discussed other factors referred to above, as well as matters like the seasonal nature of the apparel business, the training of sales personnel, and the weather, all of which have an impact on sales. Neither attempted to correct the survey or proposed an alternative damage figure.

Of course, Sam's was not required to prove damages to a certainty. It merely had to present evidence allowing a jury to find with reasonable certainty that the damages claimed actually occurred, or could reasonably have occurred, as a result of the defendant's action. *See, e.g., Mitsui O.S.K.*

*Lines v. Horton & Horton, Inc.,* 480 F.2d 1104, 1106 (5th Cir.1973).

There are a number of formulas for calculating the effect of advertising on sales, and the calculations are admittedly difficult. *See, e.g.,* L. Parsons & R. Schultz, Marketing Models and Economic Research 148–53 (1976). But merely because undertaking a proper calculation would be difficult does not relieve Sam's of its duty to demonstrate its damages with evidence rising above speculation. We cannot accept Dunaway's survey, arguably riddled with inaccuracies, as sufficient evidence to support this verdict. The $50,000 award is simply contrary to reason; if companies could gain $239,000 in gross sales and $57,000 in net profits from a comparative advertisement costing $5,000 to produce and televise, such ads would inundate us every time we turn on our television sets. If Sam's achieves such results, we do not understand why there are any markets in which it does not broadcast comparative price commercials. If $50,000 in profit were lost by failure to run twelve ads, for a total of six minutes, each store in markets where the ad runs must generate tremendous annual profits. Neither the record nor our common sense establishes that they do.

Therefore, we are constrained to conclude that the record is barren of evidence to support a verdict of this size and that allowing it to stand would constitute a grave injustice. This requires us to conclude that the district court abused its discretion in not granting a new trial or remittitur on the damage issue.[21]

Sam's did prove some damage. It spent about $2,500 to prepare the commercials. It arguably suffered some loss of the profit that it might have reaped had the ads been

---

**19.** Dunaway conceded that this difficulty could alter his results "to some degree." In fact, the newly opened store accounted for 30% of Sam's New Orleans sales in November, 1977 and for 25% of its December sales.

**20.** Dunaway allowed that there is "probably a difference" in the figures to the extent that a lot of advertising was done in all markets in 1978 and not in 1979. He did not, however,

have any figures to determine the total amount of advertising or the difference, if there was any, in the amount of advertising during the two years.

**21.** The term "abuse of discretion" is unfortunate, for it has no pejorative content. *See Conway v. Chemical Leaman Tank Lines,* 610 F.2d 360, 367 n. 9 (5th Cir.1980) (per curiam).

broadcast. We cannot, therefore, say that Sam's totally failed to prove any damage, which would require us to dismiss its claim. *See Pizani v. M/V Cotton Blossom,* 669 F.2d 1084, 1089 (5th Cir.1982); *Nat Harrison Associates, Inc. v. Gulf States Utilities Co.,* 491 F.2d 578, 588 (5th Cir.1974).

Basing our judgment on the standards set in *Glazer v. Glazer,* 278 F.Supp. 476 (E.D. La.1968), and approved by this court in *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1046–47 (5th Cir.1970), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972), we assess as the maximum amount a reasonable jury might have awarded the cost of the commercials plus six times their cost as lost profit, a total of $17,500. Accordingly, we remand for a new trial on the issue of damages unless Sam's will accept a remittitur reducing its damages to the sum of $17,500.[22]

The parties may rightly question how, in view of our analysis of the evidence, we arrive at this amount. It is, we candidly state, not fairly deduced from the evidence before us. Rather, we must resort to the test: what is the maximum verdict that we would consider not to be excessive in light of Dunaway's testimony and Cosmos' failure to present an alternative for calculating an award? This requires us to draw a line, and, whenever a difference between what is acceptable and what is not allowable must be precisely located, the point of division cannot be fixed by objective standards. The evidence submitted by Sam's would warrant the jury in finding that some profits were lost. Our sense of proportion would not be offended if the jury had fixed the loss of profits at some amount up to $15,000, plus $2,500 for the cost of producing the commercial. It is taxed by a verdict in excess of that amount.

The judgment of the district court holding Cosmos liable to Sam's for breach of contract is AFFIRMED. The denial of the motion for a new trial is REVERSED. The case is REMANDED for a new trial on damages only unless Sam's accepts the re-

mittitur reducing the verdict to $17,500 plus interest and costs.

---

22. Our power to enter a remittitur is the same as that of the district court. *Carlton v. H.C.*

*Price Co.,* 640 F.2d 573, 582 n. 14 (5th Cir. 1981).